98 So.2d 473 (1957)
John W. MARTIN, as Trustee of the Property of Florida East Coast Railway Company, Appellant,
v.
Maynard R. TINDELL, Appellee.
Supreme Court of Florida.
November 13, 1957.
*474 Anderson, Scott, McCarthy & Preston, Dwight Sullivan, and Russell E. Frink, Miami, for appellant.
Nichols, Gaither, Green, Frates & Beckham, William S. Frates, Walter H. Beckham, Jr., and Sam Daniels, Miami, for appellee.
O'CONNELL, Justice.
Maynard R. Tindell, appellee here, was plaintiff below. John W. Martin, as Trustee of the property of the Florida East Coast Railway Company, the appellant here, was the defendant below. The parties will be referred to as they stood in the trial court.
Plaintiff brought an action for personal injuries under the Federal Employers' Liability Act, 45 U.S.C.A. § 51 et seq. On a jury trial a verdict in amount of $125,000 was rendered for plaintiff. A motion for new trial was denied, final judgment was entered and this appeal taken therefrom.
Plaintiff was a traveling mechanic for the defendant railroad. As such it was his duty to make light repairs to the cars while the train was underway.
On several occasions prior to January 20, 1953, the day of the accident to plaintiff, it had been reported to the defendant that water was leaking from an air conditioning unit in the tavern car, Lake Okeechobee, in which the plaintiff sustained his injury. Although the defendant worked on the car in the railroad yard on two occasions, the cause of the leak was not discovered prior to the injury to plaintiff. There was evidence that on the day of the accident the trainmaster was advised by the bartender assigned to the tavern car that the air conditioning unit was leaking and that the car should be "cut out", but that despite this warning the car was sent out on the train when it left Miami going North.
While the train was proceeding North, the plaintiff attempted to repair the unit so as to stop the leak which was spilling water onto the floor of the tavern car. Finding that he could not stop the leak, plaintiff notified the Conductor and advised that the car be taken out of the train because of the dangerous condition created by the water on the floor. Immediately thereafter he walked on the wet floor, slipped and fell, sustaining a back injury.
Plaintiff was treated for the back injury at the East Coast Hospital Association at St. Augustine, Florida. He was also referred to other physicians by the doctors of the hospital. Plaintiff returned to work on May 1, 1953, at the same rate of pay but at lighter work.
On September 1, 1953, plaintiff suffered a coronary thrombosis. He was also treated for this condition at the East Coast Hospital Association. He contends that the accident *475 caused not only the back injury but the heart condition as well.
Plaintiff filed this suit in October 1953. It was tried in October 1954.
The defendant complains that the trial court committed error in refusing to grant defendant's motions for compulsory physical examination of the plaintiff.
Under Florida C.L. Rule 28, now Rule 1,29, 1954 Florida Rules of Civil Procedure, it is obvious that the granting of an order for physical examination is at the discretion of the trial judge. The rule reads that the court "may" order the examination and provides that "the order may be made only upon good cause shown * * *."
In the two motions before us the grounds or cause shown was "to determine the exact nature and extent of the injuries alleged to have been sustained by plaintiff as a result of the negligence of the defendant." The defendant did not state that it did not have this information.
We realize that motions for compulsory physical examinations in personal injury actions are usually granted as a matter of course by trial judges, and that it is the common practice of attorneys to file a perfunctory motion such as was filed here. In the usual situation where a plaintiff is treated by his personal physician in a private hospital so that the defendant does not have access to the reports of either the hospital or the physician such a motion might be sufficient and a denial thereof be an abuse of discretion.
But in the case before us we find that the plaintiff was treated for his back injury and his heart condition in the East Coast Hospital Association, a non-profit hospital supported mainly by railroad employees' contributions with any deficit being made up by the defendant railroad. There is no question but what the defendant had access to the hospital records and to the reports of the physicians of the hospital, and could have obtained from these records and physicians the information which would have been revealed by a compulsory physical examination. It appears that the hospital physicians were required to and did submit medical reports to the defendant's legal staff. The chief surgeon for the defendant was the plaintiff's family physician and treated the plaintiff for both his back injury and in part for his heart condition, the last treatment which he had rendered to the plaintiff being approximately two weeks prior to the trial.
The defendant complains that it was prejudiced by the court's refusal to order the compulsory physical examination because the plaintiff's attorneys at the trial attacked the physicians who testified for the defendant as not being qualified specialists.
We realize that it is of some importance in a jury trial to have a specialist testify, yet the question before us is did the trial judge abuse his discretion in denying the motions for compulsory physical examination.
Under the facts in this case we are of the opinion that the trial judge did not abuse his discretion in denying the motions for compulsory physical examination.
Defendant next contends that the plaintiff's negligence in stepping on the wet floor which he knew to be, and which he had warned the conductor to be, dangerous was the sole proximate cause of his injury, and that, therefore plaintiff cannot recover, and a directed verdict should have been given in defendant's favor. Under this contention defendant also argues that the plaintiff cannot recover because of the unsafe condition since it was his duty to repair and correct it.
The facts of this case clearly show that the plaintiff was negligent. Yet we cannot say that the absence of negligence on the part of the defendant was so clear as to justify the trial court directing a verdict for the defendant.
*476 The facts of this case show that the faulty condition of the air conditioner and the resulting leaking of water on the floor of the car had been reported to the defendant on at least four occasions in the six-day period prior to and including the day of the accident. The evidence shows that the cause of the flooding was a clogged drain pipe underneath the car. It could not have been repaired while the train was making its run.
If the plaintiff had been a mechanic hired to make repairs in the shop of defendant, he might not be able to complain of his injury since the correction of the defective unit would require that he work under the conditions created by the faulty mechanism. But the plaintiff was a traveling mechanic. Defendant in its brief states that his duties were to ride on certain of defendant's trains, make inspections of mechanical equipment, make such repairs as he could while the train was en route and report any defects he observed. The condition which caused his injury was not a result of his failure to correct a condition which he could have remedied, but rather came about because of the defendant's use of a tavern car which it had been repeatedly warned had a faulty air conditioning unit therein which leaked water onto the floor creating an unsafe condition.
Had the defendant not been warned of the defective unit and resulting unsafe condition of the floor in the car prior to its being used on the day of the accident, or had the leak developed for the first time on the occasion of plaintiff's injury then the liability of the defendant might well be different.
We think a jury might well determine from the facts of this case that the defendant was negligent in using the tavern car on the day of plaintiff's accident and therefore that it was not error to refuse the directed verdict for defendant.
The Federal Employers' Liability Act, 45 U.S.C.A. § 51 et seq., has stricken the defenses of contributory negligence and assumption of risk. Comparative negligence has been substituted therefor. Boat Dagny, Inc., v. Todd, 1 Cir., 1955, 224 F.2d 208 and Martin v. Riley, 1 Cir., 1956, 226 F.2d 612. The negligence of the plaintiff therefore does not prevent his recovery if the defendant was also guilty of negligence.
We have carefully examined and compared the many cases, cited by counsel for defendant in their able briefs, on the question of negligence of an employee precluding recovery and the cases holding that an employee whose duty is to make repairs cannot complain that the employer is negligent for allowing a mechanism to get out of repair. We do not find such cases to be applicable here, for as above stated contributory negligence on the part of the employee does not bar recovery. Further, in the case at bar the jury could have found the defendant guilty of negligence not for allowing the air conditioning unit to become defective, but rather for using the tavern car knowing that it was unsafe.
Therefore viewing the evidence, including all inferences fairly deducible therefrom, in the light most favorable to plaintiff, as we are required to do, we conclude that the trial judge did not commit error in denying defendant's motion for directed verdict.
Defendant next contends that the trial judge committed clear error in a charge given the jury. After the jury had retired to consider its verdict, it returned to the court room and asked for further instructions. The following transpired:
"* * * (1) The Court: Do you have a question to ask the Court?
"(2) The Juror: There was some contention over the fact  Everyone agreed they had no disagreement in the fact of thinking that the railroad had some responsibility in regards to the boy's accident, but it was also considered by, I will say at least one, that there was some understanding that the *477 boy was to a certain extent responsible for the accident, and there is the contention, I believe 
"(3) The Court: I think that has been answered by the instruction already given you. If you have found the railroad to be negligent, as you say you have found, and also find that the plaintiff has been contributorily negligent, and under the law of comparative negligence it is your duty to do this: First you determine the amount of damages you would award for the negligence of the defendant. That is one figure. Then you determine in your own minds how much you should take off of that figure for the contributory negligence of the plaintiff, and then bring in a verdict for the balance.
"(4) The Juror: Judge, if I may be permitted  I accept the responsibility. That was what I tried to be considering but I got no  I mean I was the only one. I thought it should be considered.
"(5) The Court: Well, that is your prerogative.
"(6) The Juror: That there was some responsibility, your Honor, to the boy, being an employee. The contention that it was  that part of the responsibility of the accident that happened was his responsibility, and I tried to explain that we were instructed to that effect.
"(7) The Court: You were instructed to that effect and also you were instructed to this effect: That the plaintiff occupies a different status from anybody else on that train because he was employed to work there and it was the duty of the railroad company to provide a safe place for him to work, and you were instructed to that effect.
"(8) The Juror: Were our instructions so as not to regard this boy as being in anywise negligent as he was an employee of the railroad which was his duty to work for a railroad?
"(9) The Court: It was his duty to work there and it was the duty of the railroad company to provide him a safe place to work.
"(10) The Juror: Regardless of him?
"(11) The Court: No. If he is contributorily negligent, if you find from some act of his that he was contributorily negligent, you must subtract whatever amount you think he is responsible for from the full amount that you would award otherwise and bring in a verdict for the balance. * * *"
The defendant complains that the statement made by the trial judge in the foregoing exchange, items (7) and (9), are clear error since they indicate that the defendant railroad had an absolute duty to provide a safe place for plaintiff to work, while the law only requires that the defendant exercise reasonable care to provide a safe place for its employees to work. There can be no dispute that this is the law. Yazoo & Mississippi Valley R. Co. v. Mullins, 1919, 249 U.S. 531, 39 S.Ct. 368, 63 L.Ed. 754; Baltimore & Ohio S.W.R. Co. v. Carroll, 1930, 280 U.S. 491, 50 S.Ct. 182, 74 L.Ed. 566; Atlantic Coast Line R. Co. v. Dixon, 5 Cir., 189 F.2d 525.
It is well settled that in passing upon a single instruction or charge it should be considered in connection with all the other instructions and charges bearing on the same subject, and if, when thus considered, the law appears to have been fairly presented to the jury, an assignment predicated upon the giving of such instructions or charge must fail, unless under all the peculiar circumstances of the case the court is of the opinion that such instructions or charge were calculated to confuse, mislead or prejudice the jury. Atlantic Coast Line R. Co. v. Crosby, 1907, 53 Fla. 400, 43 *478 So. 318. Further this Court in Skinner v. Ochiltree, 1941, 148 Fla. 705, 5 So.2d 605, 607, 140 A.L.R. 410 said on the same subject "if the instructions assigned as error, considered in the light of the entire charge given, are reasonably free from error, then the charge as given will be sustained."
Standing alone the above referred to statements of the trial judge, items (7) and (9), are error but when considered in connection with the other charges given by the court, and particularly when read in connection with all of the discussion had between the trial judge and the juror on the jury's return for further instructions we have concluded that the statements were not prejudicial error such as would infect the minds of the jury so as to cause it to use an improper yardstick by which to measure the duty and negligence of the defendant.
From a careful reading of the discussion between the trial judge and the juror as above set forth it appears that the jury had already agreed that the defendant was negligent for the juror said in his first question:
"Everyone agreed that they had no disagreement in the fact of thinking that the railroad had some responsibility in regards the boy's accident. * *"
From the juror's questions it appears that the matter troubling him, and in which he was apparently in conflict with the remainder of the jury, was the question of comparative negligence. The trial judge seems to have properly clarified that question by his statements.
In addition to the foregoing it appears from the record that the trial judge, in the charges given at the request of both the plaintiff and defendant, on several occasions properly charged the jury that the defendant was required to use only reasonable care in furnishing the plaintiff a safe place to work, not to furnish him a safe place to work.
We are of the opinion that when considered in the light of the circumstances under which they were made and considered with all the charges given the statements complained of were not reversible error.
Finally, the defendant contends that the evidence connecting the fall and back injury with the subsequent heart condition suffered by the plaintiff is so conjectural and speculative that as not to be sufficient to sustain a finding that the heart condition was related to the accident suffered by the plaintiff. Defendant then logically reasons that if the accident is not causally related to the heart condition the verdict is excessive since $125,000 would be too great an award for the back injury alone.
We are inclined to agree that on the record in this cause the verdict would be excessive for the back injury alone. Therefore we must determine whether there was sufficient competent evidence upon which the jury could have found that the back injury was causally related to the heart condition.
Defendant calls to our attention that the plaintiff did not testify about the pain, worry, anxiety and nervousness which are asserted to have followed his back injury and precipitated the heart attack. Yet through the testimony of the heart specialist who testified on behalf of the plaintiff there is sufficient evidence in the record concerning the worry, pain, anxiety and nervousness following the accident to reasonably support the conclusions given by this specialist that the fall and back injury produced conditions which precipitated the heart attack.
It is true that the doctor who treated the plaintiff for both his back and heart, and who testified for the defendant, indicated that the plaintiff's anxiety or nervousness stemmed from plaintiff's failure to get a promotion, while the plaintiff's specialist in detailing the plaintiff's case history stated that it was caused by the back injury. This presented a conflict which the jury had the right to and did resolve. We cannot *479 say, on the evidence in the record, that they were wrong.
It follows that we must reject defendant's last contention, as we have the others made by it.
This cause has been ably argued before this Court on three occasions. It has received thorough consideration by this Court, and after such we have concluded that the judgment appealed from should be and is hereby
Affirmed.
TERRELL, C.J., HOBSON and THORNAL, JJ., and CRAWFORD, Circuit Judge, concur.
DREW and BARNS, JJ., dissent.
BARNS, Justice (dissenting).
I am constrained to dissent to Court's conclusion, as expressed by it in the opinion by Mr. Justice O'CONNELL, holding, in effect, that the plaintiff's declarations made to physicians employed as prospective expert witnesses to be substantive evidence of the truth of the matter so declared.
The basis in law for such dissent is that the Court has seemingly overlooked and failed to follow the hearsay rule of the law of evidence which rule of law, as stated by Wigmore, is as follows:
"* * * It is here sufficient to note that the Hearsay rule, as accepted in our law, signifies a rule rejecting assertions, offered testimonially, which have not been in some way subjected to the test of cross-examination." 5 Wigmore on Evidence, page 3 (3rd Ed.).
"Under the name of the Hearsay rule, then, will here be understood that rule which prohibits the use of a person's assertion, as equivalent to testimony to the fact asserted unless the assertor is brought to testify in court on the stand, where he may be probed and cross-examined as to the grounds of his assertion and of his qualifications to make it." 5 Wigmore on Evidence, page 9 (3rd Ed.).
"* * * What we are here concerned with is a different notion, namely, that when a specific person, not as yet in court, is reported to have made assertions about a fact, that person must be called to the stand, or his assertion will not be taken as evidence." 5 Wigmore on Evidence, page 10 (3rd Ed.).
The trial of the case commenced on October 26, 1954. Mr. Tindell was "examined" by plaintiff's witness, Dr. O. Whitmore Burtner, a specialist in internal medicine, on October 15 and 19, 1954, and he was also "examined" by plaintiff's witness, Dr. Paul S. Jarrett, a specialist in psychiatry and neurology, on October 6 and 19, 1954. Both of these doctors, plaintiff's witnesses, testified that they found Tindell in an "anxiety-tension state." It is not shown that he went to either doctor for treatment or that either doctor undertook to treat him as their patient. No other witnesses testified on behalf of the plaintiff as to his physical condition or as to the cause of his heart condition, and the defendant's expert witnesses testified that in their opinion the fall did not cause his heart condition.
The plaintiff-appellee testified but gave no testimony as to his physical or mental condition at any time and the only matter concerning the plaintiff's mental or physical condition between the fall in January and the heart attack in September, 1953 on behalf of the plaintiff is the narration by plaintiff's experts, principally Dr. Burtner, of the declarations made to them by the plaintiff in October, 1954 shortly before the trial commenced.
The law seems to favor the admissibility of declarations made to a physician by a patient as to his subjective symptoms as trustworthy even as to the truth of the statements, but to apply the hearsay rule and to exclude such statements when made to a physician employed as a prospective expert witness as untrustworthy. However *480 if admitted under the latter circumstances then they are not substantive evidence of the truth of matters declared to the physician but are received only as related to the opinion evidence and not for the purpose of establishing the truth of matters narrated to the physician as a history of the case.
Plaintiff's witness, Dr. Burtner, testified at length wherein he narrated the "history of the case" as it had been related to him by Tindell and as he had observed from the hospital records; his narration by Tindell's extra-judicial statements were extensive. Thereafter, on direct examination, the doctor, basing his opinion on his examination of Tindell and the "history" of the case previously narrated by him as obtained from Tindell and other sources, testified that the coronary thrombosis had been caused because of Tindell's emotional condition that had developed between the fall in January and the heart attack in September of the previous year, and that the antecedent emotional state termed by the doctor as "anxiety-tension state" was the "trigger mechanism" that caused the thrombosis.
The substance of Dr. Burtner's testimony was as follows:
"Q. With respect to the accident which he had back in January of 1953 and the coronary attack or the heart attack which he had in September of 1953, what in your opinion is the connection, if any, between the accident which he had and the symptoms that you have described in the history, and the heart attack which he had in September? A. As a result of the accident, he developed a rather severe anxiety-tension state, with these symptoms I have outlined; the principal ones being nervousness, the feeling of weakness, the feeling of being under a lot of tension and strain.
"We call that one of the most important trigger mechanisms. That is a mechanism that has to do with the origin of a heart attack, his tension and strain from some cause, such as nervous tension.
"No one knows the exact mechanism. We know that if you are under nervous tension and strain your peri-pheral blood vessels may constrict a little bit. It is felt that sometimes if you are under a lot of nervous tension and strain the coronary arteries may actually dilate a little bit, that being Nature's way of getting more blood to the heart, but it has been found as a general observation over and over again that people who are under nervous tension and strain have a great propensity to develop coronary thrombosis because of the fact that anxiety and nervous tension, if it is over a long enough period and if it is severe enough, may very well act as the trigger mechanism that will cause the spasm of the coronary vessel in some one location, and by causing a spasm perhaps let a clot develop there and then let the thing go on from there.
"Q. In your opinion did this accident and the injury to the back and the pain and the anxiety tension that developed from the accident, was that the trigger mechanism in your opinion in this case which triggered the heart condition of Mr. Tindell? A. In my opinion, it is. I am very much impressed with that relationship. There is no way of actually proving it. We do know that people who are under a lot of nervous tension and strain are very apt to have this sort of thing happen.
"A great deal depends on susceptibility. Were there any other factors there that might have made this man more susceptible and therefore might have made this trigger mechanism  given it a greater chance to operate.
"I think perhaps there might be a few factors that I ought to mention briefly. Because of the fact that we *481 do know that if you are of a short stature, pyknic build, broad shouldered, you are more apt to be susceptible to coronary thrombosis than if you are tall and slender.
"This is just a general statement and it may not have much to do with this case. If you are a little overweight, that is one thing stressed these days from the statistics that have been compiled. Overweight predisposes a great deal to the development of a coronary occlusion, that is to say, of a coronary thrombosis.
"An elevation of the blood cholesterol is worthy of more than passing interest. We are hearing a lot about it. There is a great deal of work being done, and yet we know if we take all the people who have a blood cholesterol of 334 milligrams per cent, we would find that the majority of them don't live out quite the normal life span and some of them perhaps less than normal life span.
"These things that I have mentioned may have some bearing. I think the important thing too is that anxiety over a long period of time in considerable degree is often the trigger.
"We find that so frequently in professional people, because they are the ones who are especially susceptible to coronary thrombosis. I am thinking especially of my own profession.
* * * * * *
"Q. (By Mr. Beckham) Doctor, just one final question, sir. I want to be sure that we have no mistake. In the interest of saving time I just say this: Do I understand from your testimony that it is your opinion that the accident, followed by the state of anxiety tension that you have described, was the precipitating factor that precipitated the heart attack which Mr. Tindell had in September, 1953? A. Yes, I would put it this way: I would say that as a result of the accident this man developed an unusual amount of anxiety-tension state and that the anxiety-tension state, because it was so severe and lasted as long as it did, was the trigger mechanism in all probability as near as anyone can possibly tell of the actual coronary thrombosis and myocardial infarction. That is the important trigger mechanism. * * *"
Plaintiff-appellee's other expert witness, Dr. Paul S. Jarrett, a specialist in psychiatry and neurology, testified that Tindell at the time of examination was in an "anxiety-tension state" which was based on statements made to him by Tindell, his examination and the hospital records. Dr. Jarrett did not narrate much of the "history of the case" as given him by Tindell but did state some of the symptoms of Tindell, both subjective and objective. However, his testimony was mostly confined to his findings of Tindell's then physical condition and answering questions related to the science of medicine in the field in which he specialized, which included diseases of the heart only as related to neurology. Dr. Jarrett testified that he believed the pain in the heart was the result of his back pain, but he did not testify that the coronary thrombosis was the result of the fall. Of the back pain as related to the thrombosis his testimony was:
"* * * Q. What effect, if any, do you think it would have on the actual thrombosis and heart attack that he had: Is that included in what you mentioned? A. If it lasts long enough and the circulation is decreased long enough to the heart, then a thrombosis occurs. Most people with back pain wouldn't have such attacks of heart pain, and these things come up when there is disease of the coronary arteries, but a lot of people who have disease of the coronary arteries don't have the heart pain, and it takes something acting upon coronary artery disease to produce the heart pain, and I believe that his back pain in this particular *482 patient does trigger or set off the blood vessel condition which sets up the pain in his heart muscle.
* * * * * *
"Q. Can worry from other causes, in your opinion, precipitate a heart attack? A. Yes. You mean from other causes?
"Q. Causes other than worry over a traumatic injury? A. Yes.
* * * * * *
"Q. In your practice, if you have a man with a heart condition, you don't diagnose for him do you, on the heart condition, except as it is related to your field? A. I would treat him only in conjunction with some other physician who was handling the heart condition."

Declarations of Bodily Condition made to Physician Consulted for Treatment
The opinion by Judge L. Hand in the case of Meaney v. United States, 2 Cir., 1940, 112 F.2d 538, 539, 130 A.L.R. 973, seems to well state the law:
"The insured's declarations seem to have been offered as a narrative of his past condition; so far as appears they were no part of the basis of the physician's opinion as to his condition; at least they were not offered as such. They were therefore hearsay, and moreover, they did not fall within the generally accepted exception in favor of spontaneous expressions of pain or the like. It is quite true that this exception includes narrative statements as well as mere ejaculations, and that it has been extended to a declaration of present symptoms told by a patient to a physician. * * * The utterances of a patient in the course of his examination, so far as they are spontaneous, may be merely ejaculatory  as when he emits a cry upon palpation  or they may be truly narrative; and it will often be impossible to distinguish rationally between the two; between an inarticulate cry, for example, and a statement such as: `That hurts'. The warrant for the admission of both is the same; the lack of opportunity or motive for fabrication upon an unexpected occasion to which the declarant responds immediately, and without reflection. But most of what he tells will not ordinarily be of this kind at all; there may be, and there is in fact, good reason to receive it, but it is a very different reason. A man goes to his physician expecting to recount all that he feels, and often he has with some care searched his consciousness to be sure that he will leave out nothing. If his narrative of present symptoms is to be received as evidence of the facts, as distinguished from mere support for the physician's opinion, these parts of it can only rest upon his motive to disclose the truth because his treatment will in part depend upon what he says. That justification is not necessary in the case of his spontaneous declarations, even when they are narrative; but it is necessary for those we are now considering. This, as we understand it, is the doctrine of Barber v. Merriam, 11 Allen, Mass., 322.
"The same reasoning applies with exactly the same force to a narrative of past symptoms, and so the Supreme Court of Massachusetts, declared obiter in Roosa v. Boston Loan Co., 132 Mass. 439. A patient has an equal motive to speak the truth; what he has felt in the past is as apt to be important in his treatment as what he feels at the moment. Thus, in spite of the dicta in Northern Pacific R.R. v. Urlin, supra (158 U.S. 271, 15 S.Ct. 840, 39 L.Ed. 977) and Boston & Albany R.R. v. O'Reilly, supra (158 U.S. 334, 15 S.Ct. 830, 39 L.Ed. 1006) that only declarations of present symptoms are competent, several federal courts have seemed not to take the distinction *483 between declarations of present and past symptoms, provided the patient is consulting the physician for treatment, and Professor Wigmore appears to assent. Wigmore § 1722. United States v. Tyrakowski, 7 Cir., 50 F.2d 766, 771; United States v. Nickle, 8 Cir., 60 F.2d 372, 374; United States v. Roberts, 10 Cir., 62 F.2d 594, 596; United States v. Calvey, 3 Cir., 110 F.2d 327, 330. * * *
"It is indeed always possible that a patient may not really consult his physician for treatment; the consultation may be colorable. The judge has power to prevent an abuse in such cases, and here as elsewhere, when the competency of evidence depends upon a question of fact, his conclusion is final. He must decide before admitting the declarations whether the patient was consulting the physician for treatment and for that alone. Unless he is so satisfied, he must exclude them, though it is true that if he admits them, the defendant may still argue that they are untrustworthy. * * *"

Declarations made to Physicians Employed as Prospective Expert Witnesses.
McCormick on Evidence, pages 565-566 seems to make a clear presentation of the law applicable to declarations made to physicians employed as prospective expert witnesses as follows:
"Many courts draw a sharp line, evidently, between physicians consulted for treatment and those employed solely as prospective expert witnesses. As to the latter, they have been inclined to impose special restrictions which are set out below.
"1. It has been held, probably by the majority of courts that have passed on the question, that descriptive statements of present pain or symptoms when made to a doctor employed only to testify do not qualify for admission as substantive evidence under the present exception to the hearsay rule for statements of bodily condition.
"2. The rule prevails generally that expert witnesses may testify to the information upon which they have relied in reaching their conclusions, and in respect to medical witnesses this practice would permit the doctor to give a general account not only of facts observed, but of the `history' including the patient's statements as to injury, past symptoms, and present feelings as of the time of the examination. When presented for this purpose, the statements are not evidence of the matters stated, and hence not hearsay, but are merely explanatory of the opinion, enabling the jury to weigh it in the light of its basis. Most courts make no distinction, in respect to using the `history' as grounds of opinion between doctors who attended for treatment and those who examined the patient only to prepare themselves to testify. A few courts, however, have held or intimated that these latter experts may not recount what the patient has told them, even for the non-hearsay purpose of explaining the grounds of opinion.
"3. The minority group of courts which adopt this last restriction limit correspondingly the admissibility of the opinions of the expert who has been employed only to examine and testify. Such experts, they hold, are confined to giving opinions based solely upon the objective facts observed by them (or upon a hypothetical question), and are barred from giving an opinion based even in part upon `subjective' facts, that is upon what the patient has said about the history of his injury or his suffering and symptoms. This runs counter to the practice of medical consultants in considering such histories in forming their professional conclusions upon which they act decisively *484 every day, and counter also to the general rule as to medical testimony which admits conclusions so formed."
The establishment of a causal connection between the fall and the thrombosis is doubtful even if the "history of the case" as declared to Dr. Burtner is taken as established by competent evidence. However, there is no sworn evidence to support the "history of the case" as to the declarations made by the plaintiff just before trial as narrated by Dr. Burtner and, to a lesser degree by Dr. Jarrett. The opinions of the physicians that the coronary thrombosis was related to the fall is based on the plaintiff's declared history is not substantive evidence of the truth of the matter declared since it does not fall within any exception to the hearsay rule of evidence; hence there is no showing of causal connection between the fall and the coronary thrombosis.
For the foregoing reasons I would reverse.